## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

BARBARA JEAN FLANNERY,

                Plaintiff,

      -vs-

EQUIFAX INFORMATION SERVICES
LLC, TRANS UNION, LLC, and
INFORMATIVE RESEARCH, INC.,

                Defendants.

Case No.:3:25-cv-1573

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Barbara Jean Flannery ("Plaintiff"), a living, breathing, 55-year-old consumer, by and through her undersigned counsel, brings this Complaint against Defendants Equifax Information Services LLC ("Equifax" or "Defendant Equifax"), Trans Union, LLC ("Trans Union" or "Defendant Trans Union"), and Informative Research, Inc. ("Informative Research" or "Defendant Informative Research") (collectively, "Defendants"), for actual, statutory, and punitive damages, costs, and attorneys' fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq*., arising from Defendants' inaccurate credit reporting, wherein Equifax, Trans Union, and Informative Research all published inaccurate credit reports to Plaintiff's creditors that falsely stated that she is deceased and has no credit score, which caused Plaintiff to suffer significant damages.

## PRELIMINARY STATEMENT

1.      This is an individual action for statutory, actual, and punitive damages, costs, and attorneys' fees brought pursuant to the FCRA, 15 U.S.C. §§ 1681, *et seq.*, against three consumer reporting agencies that falsely reported Plaintiff as deceased, even when they had clear evidence in their possession that Plaintiff is very much alive. This false credit reporting has devastating consequences for individuals, like Plaintiff, who are misreported as dead. Credit bureaus will not issue credit scores on deceased consumers, and lenders will not lend to consumers who the credit bureaus and other consumer reporting agencies refuse to score. This means that someone who is being falsely reported as deceased is unable to obtain credit. This problem is especially consequential for consumers, like Plaintiff, who are seeking to obtain mortgage financing.

2.      The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, ***accuracy***, relevancy, and proper utilization of such information." 15 U.S.C. § 1681 (emphasis added). In furtherance of its underlying purposes, the FCRA sets out requirements and obligations that consumer reporting agencies must follow when consumers dispute the accuracy of the information reported in their credit reports.

3.      This case concerns Defendants' inaccurate reporting of Plaintiff as deceased and without a credit score.

4.      Plaintiff put Defendant Equifax on notice of its erroneous credit reporting via *four* written dispute letters. However, on at least three occasions, Defendant Equifax failed to timely conduct a reasonable reinvestigation of Plaintiff's disputes, correct the inaccurate information

disputed, and respond to Plaintiff within 30 days of the date it received the disputes, as required by the FCRA, 15 U.S.C. § 1681i.

5.    Accordingly, Plaintiff brings claims against Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of the contents of Plaintiff's credit reports in violation of the FCRA, 15 U.S.C. § 1681e(b).

6.    Plaintiff also brings a claim against Defendant Equifax for its failure to fulfill its reinvestigation obligations in violation of the FCRA, 15 U.S.C. § 1681i.

## INTRODUCTION

7.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

8.    However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the credit bureaus acknowledge this potential for misuse and resulting damage every time they sell their credit monitoring services to consumers and third parties.

9.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and

other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

10.    The "Big Three" major national CRAs are Equifax Information Services LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union").

11.    The Big Three sell credit information to paying subscribers (i.e., lenders, retailers, landlords, potential employers, and others) concerning individuals who may be applying for a mortgage, other credit, housing, or employment.

12.    The Big Three also sell credit information to "reseller" CRAs, such as Defendant Informative Research, who assemble and merge the credit information obtained from each of the Big Three into a three-bureau credit report, also known as a "tri-merge" or "merged infile" credit report. Defendant Informative Research combines this information, adds its own summary of the Big Three's data, and then sells the completed report to mortgage lenders throughout the country.

13.    In the parlance of the FCRA, both the information sold by the Big Three to the resellers and the information sold by resellers to the resellers' customers constitute "consumer reports." 15 U.S.C. § 1681a(d).

14.    Lenders use tri-merge reports because they want to review credit information from all of the Big Three to ensure that they do not make loans based on an incomplete picture of the credit applicant's financial position.

15.    Lenders who use tri-merge reports rely on credit scores generated by running standard algorithms against *each* of the Big Three's credit files. Tri-merge reports contain three credit scores (one for each of the Big Three), with the difference in scores being accounted for

both by variations among each of the Big Three's data as well as differences in the scoring algorithms applied by each.

16.     "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

17.     Congress made the following findings when it enacted the FCRA in 1970:

   i.    The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system;
   ii.   An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers;
   iii.  Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers; and
   iv.   There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

18.     Thus, "[t]he FCRA evinces Congress's intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

19.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C.§1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

20.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

21.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.*

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

22.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

23.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681a(4).

24.     Accordingly, Plaintiff brings claims against Defendants Equifax, Trans Union, and Informative Research for their 1) failure to follow reasonable procedures to assure the maximum possible accuracy of the contents of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and 2) Defendant Equifax's failure to conduct a reasonable reinvestigation of Plaintiff's *four* disputes of the false deceased reporting, and correct the false reporting—by removing the deceased notation and restoring his accurate credit score—within 30-days of receipt of her disputes.

25.     By way of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*, as described herein.

## THE PARTIES

26.     Plaintiff Barbara Jean Flannery ("Plaintiff") is a natural person who resides in the City of Shelton, County of Fairfield, State of Connecticut, and is a consumer as that term is defined in 15 U.S.C. § 1681a(c).

27.     Defendant Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") is a foreign limited liability company authorized to do business in the State of Connecticut, including in this District.

28.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating

information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

29.     Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a foreign limited liability company authorized to do business in the State of Connecticut, including in this District.

30.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

31.     Defendant Informative Research, Inc. ("Defendant Informative Research" or "Informative Research") is a foreign corporation with a principal place of business located at 13030 Euclid St., Garden Grove, California 92843, and is authorized to do business nationwide, including in the State of Connecticut and this District.

32.     Informative Research is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Informative Research is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

34.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

35.     The FCRA governs the conduct of consumer reporting agencies to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

36.     The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personal, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…." 15 U.S.C. § 1681(b).

37.     The FCRA further requires that when preparing consumer reports a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

### Defendants Equifax and Trans Union's Processing of Credit Information

38.     Defendants Equifax and Trans Union regularly receive information about consumers from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

39.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

40.     Defendants Equifax and Trans Union collect information from thousands of furnishers.

41.     The process by which Defendants Equifax and Trans Union receive, sort, and store information is largely electronic.

42.     Furnishers report credit information to Defendants Equifax and Trans Union through the use of coded tapes that are transmitted to Defendants Equifax and Trans Union on a monthly basis through software known as Metro 2.

43.     Defendants Equifax and Trans Union take the credit information reported by furnishers and create consumer credit files.

44.     Defendants Equifax and Trans Union maintain credit files on more than 200 million consumers.

45.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

**Defendants Equifax and Trans Union's Practices Concerning the Sale of Reports on "Deceased" Consumers**

46.     Defendants Equifax and Trans Union sell millions of consumer reports (often called "credit reports" or "reports") per day and also sell credit scores.

47.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendants Equifax and Trans Union, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

48.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendants Equifax and Trans Union, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

49.     Defendants Equifax and Trans Union routinely place a "deceased" notation or marking on reports when they are advised by any of their many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

50.     Defendants Equifax and Trans Union's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with

an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

51.     Defendants Equifax and Trans Union do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

52.     Defendants Equifax and Trans Union do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

53.     Defendants Equifax and Trans Union do not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

54.     In some cases, in order to assure accuracy, Defendants Equifax and Trans Union may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their Equifax or Trans Union credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendants Equifax and Trans Union do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file or report.

55.     Defendants Equifax and Trans Union regularly receive the "Death Master File" from the Social Security Administration, listing by Social Security number those consumers that the government believes to be deceased. But Defendants Equifax and Trans Union do not cross-reference the "X" code received from data furnishers with the Death Master File in order to

determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

56.     Defendants Equifax and Trans Union will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

57.     Defendants Equifax and Trans Union do not employ any procedures at all to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

58.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendants Equifax and Trans Union do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

59.     Even in instances where the purportedly deceased consumer communicates directly with Defendants Equifax and Trans Union, Defendants Equifax and Trans Union do not employ any procedures to assure that a consumer with a "deceased" mark on his/her report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

60.     Once a "deceased" mark is placed upon a consumer's report, Defendants Equifax and Trans Union will not calculate and will not provide a credit score for that consumer.

61.     Upon Defendants Equifax's and Trans Union's reports with a "deceased" mark sold to third parties, Defendants Equifax and Trans Union never calculate or provide a credit score for that consumer and instead report that consumer's credit score as "N/A."

62.     Defendants Equifax and Trans Union know that third party credit issuers require a credit score in order to process a given credit application.

63.    Defendants Equifax and Trans Union know that consumers without credit scores are unable to secure any credit from most credit issuers.

64.    Defendants Equifax and Trans Union know that living consumers are routinely turned down for credit specifically because Defendants Equifax and Trans Union are reporting them as "deceased" and without a credit score.

65.    Defendants Equifax and Trans Union have been put on notice for years through thousands of consumer disputes and hundreds of lawsuits that living, breathing consumers are turned down for credit specifically because they are inaccurately reporting them as "deceased" and without a credit score.

66.    Defendants Equifax and Trans Union have received and documented thousands of disputes from consumers complaining that their Equifax and Trans Union credit reports had them erroneously marked as "deceased."

67.    Defendants Equifax and Trans Union know that thousands of consumers are erroneously marked as "deceased" on their Equifax and Trans Union credit reports via an erroneous furnishing of the "X" code, even when said consumers are not on the Death Master File and are, in fact, alive.

68.    Nevertheless, Defendants Equifax and Trans Union do not employ any procedures to assure that a consumer marked as "deceased" on their Equifax and Trans Union credit report is, in fact, deceased.

69.    Even consumers who dispute the erroneous "deceased" status on their Equifax and Trans Union credit report continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

70.    Defendants Equifax and Trans Union do not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

71.    Nor do Defendants Equifax or Trans Union employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

72.    For years after a consumer's actual death, Defendants Equifax and Trans Union will continue to sell credit reports about that consumer.

73.    Defendants Equifax and Trans Union will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

74.    Defendants Equifax and Trans Union charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

75.    Defendants Equifax and Trans Union profit from the sale of reports on deceased consumers.

76.    Defendants Equifax and Trans Union have in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

77.    Defendants Equifax and Trans Union know that truly deceased consumers do not apply for credit.

78.    Defendants Equifax and Trans Union know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed,

14

identity theft using the personal identifying information of deceased consumers is known to Equifax and Trans Union to be a common and major source of identity theft.

79.    Defendants Equifax and Trans Union know that identity theft and credit fraud are serious and widespread problems in our society.

80.    Defendants Equifax and Trans Union warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and requires relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

81.    Defendants Equifax and Trans Union have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of its reports who access the purportedly deceased consumer's information.

82.    Defendants Equifax and Trans Union sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

83.    For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendants Equifax and Trans Unions to sell their credit reports, absent a court order.

84.    Defendants Equifax and Trans Union know that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Defendant Informative Research's Process of Assembling and Merging Consumers' Credit Information into Tri-Merge Credit Reports**

85.     The Big Three regularly receive information from various sources around the country, including banks, credit unions, automobile dealers, student loan providers, public information vendors, the Social Security Administration, and others. These sources are known as "furnishers" within the credit reporting industry and under the FCRA. *See* 12 CFR § 1022.41.

86.     The Big Three collect information from thousands of furnishers and distribute that information to their many subscribers, including Defendant Informative Research.

87.     Informative Research's customers, in turn, use that information to make decisions as to whether to extend credit to a particular consumer and for other purposes permitted under the FCRA.

88.     The process by which the Big Three receive, sort, and store information is largely electronic.

89.     The Big Three take the credit, public record, and other information reported by furnishers and use it to create consumer credit files.

90.     The Big Three maintain credit files on more than 200 million consumers.

91.     When Informative Research requests credit information from the Big Three for a particular consumer, the Big Three send raw credit data to Informative Research electronically.

92.     Informative Research does nothing to ensure that the credit information it receives is, in fact, accurate.

93.     After receiving the raw credit data from the Big Three for a particular consumer, Informative Research assembles, merges, normalizes, and summarizes that data into a tri-merge credit report.

94.     As far as Informative Research is concerned, accuracy means outputting the same credit data that it received from the Big Three without alteration.

16

95.     Informative Research does not analyze the accuracy of the underlying credit data it receives from the Big Three in any way, but merely accepts it at face value.

96.     Informative Research does not take any action to determine if the information it receives from one of the Big Three is facially incompatible with information received from another of the Big Three.

97.     Informative Research does not employ reasonable procedures to assure the maximum possible accuracy of the credit information it includes in the tri-merge credit reports it sells to mortgage lenders throughout the country.

**Defendant Informative Research's Practices Concerning the Sale of Reports on the "Deceased"**

98.     Informative Research sells thousands of tri-merge credit reports each year, and also sells credit scores.

99.     Informative Research sells tri-merge credit reports and credit scores to various markets, including but not limited to the mortgage financing and lending industry.

100.    Pursuant to 15 U.S.C. § 1681e(b), Informative Research is required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

101.    Informative Research routinely sell credit reports for *living* consumers with active credit histories which include a notation indicating that the *living* consumer is "deceased" and therefore does not have a credit score.

102.    Informative Research does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" notation on that consumer's tri-merge credit report.

103.    Informative Research does not employ any procedures *at all* to assure that a consumer with a "deceased" notation on his/her tri-merge credit report is, in fact, actually deceased before including the "deceased" notation on that consumer's report and selling that report for profit.

104.    Even in instances where other data on the face of the consumer's tri-merge report indicates that the consumer is alive, such as a current and active credit history, Informative Research employs no procedures to assure that a consumer with a "deceased" notation on their report is, in fact, actually deceased before including the "deceased" notation in that consumer's file.

105.    That is, when it receives information from one of the Big Three that a consumer is deceased, and information from another of the Big Three that is incompatible with that information – such as an active credit score (indicating the other agency does not believe the consumer is deceased), and open accounts with a very recent payment history – Informative Research makes no investigation.

106.    Once a "deceased" notation is included in a consumer's report from one of the Big Three, Informative Research cannot provide a credit score for that consumer for that member of the Big Three.

107.    Instead, when Informative Research sells a report with a "deceased" notation to a third party, it reports that consumer's credit score as "N/A," for that member of the Big Three, while simultaneously providing scores based on the data from the other of the Big Three.

108.    Informative Research knows that third party credit issuers require a credit score from *all* of the Big Three in order to process a given credit application.

109.    Informative Research also knows that consumers without credit scores from *all* of the Big Three are unable to secure credit from most credit issuers.

110.    Informative Research also knows that living consumers are routinely turned down for credit specifically because it is reporting them as "deceased" and without a credit score.

111.    Informative Research has been put on notice through consumer disputes that living, breathing consumers are turned down for credit specifically because it is reporting them as "deceased" and without a credit score.

112.    Nevertheless, Informative Research has an automated process in place that accepts all credit data received from the Big Three as accurate and employs no procedure(s) to assure that a consumer marked as "deceased" by at least one of the Big Three on their tri-merge credit report is, in fact, deceased.

113.    Informative Research has no independent procedure to change an erroneous deceased status on its own, and merely parrots the credit information it receives from the Big Three.

**Synchrony Bank Denies Plaintiff's Credit Application in June 2024**

114.    On or about June 19, 2024, and needing a credit card with cashback perks to make everyday purchases, Plaintiff applied to get approved for a PayPal Cashback Mastercard account and credit card, which is issued through Synchrony Bank.

115.    As part of her online application, Plaintiff provided her personal identification information, including her Social Security number, and authorized Synchrony Bank to request her credit report(s) and score(s).

116.    On June 19, 2024, in order to determine whether Plaintiff qualified for the credit that she sought, Synchrony Bank purchased a copy of Plaintiff's credit report from Trans Union.

117.    Synchrony Bank was unable to approve Plaintiff for a PayPal Cashback Mastercard account and credit card and denied Plaintiff's credit application.

118.    On or about June 19, 2024, Trans Union published a credit report regarding Plaintiff to Synchrony Bank stating that Plaintiff is "deceased" and, consequently, that she does not have a credit score.

119.    On or about June 20, 2024, Synchrony Bank mailed Plaintiff written correspondence confirming the same. Synchrony Bank's denial letter specifically stated, in relevant part, "We regret that we are unable to approve your request at this time for the following reason: The credit report retrieved indicated that the applicant is deceased."

120.    Defendant Trans Union's credit report regarding Plaintiff was grossly inaccurate: as of June 20, 2024, Plaintiff was not deceased, and she had a credit score.

121.    Due to Defendant Trans Union's inaccurate reporting, Plaintiff was denied the credit she sought and needed from Synchrony Bank/PayPal.

122.    By reporting Plaintiff as deceased and having no credit score to her potential creditor, Synchrony Bank, Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the contents of Plaintiff's credit report and the credit information it published and maintains concerning Plaintiff.

**Tractor Supply Denies Plaintiff's Credit Application in December 2024**

123.    On or about December 10, 2024, and needing a retail credit card to make everyday purchases, including purchasing food for her dog and parts for her tractor and lawn mower, Plaintiff applied for a Tractor Supply retail credit card, which is issued through Citibank, N.A.

124.    As part of her credit application, Plaintiff provided her personal identification information, including her Social Security number, and authorized Tractor Supply/Citibank, N.A. to request her credit reports and scores.

125.    On or about December 10, 2024, in order to determine whether Plaintiff qualified for the credit that she sought, Tractor Supply/Citibank, N.A. purchased a copy of Plaintiff's credit report from Equifax.

126.    On or about December 10, 2024, Defendant Equifax published a credit report regarding Plaintiff to Tractor Supply/Citibank, N.A. stating that Plaintiff is "deceased" and, consequently, that she does not have a credit score.

127.    Defendant Equifax's credit report regarding Plaintiff was grossly inaccurate: as of December 10, 2024, Plaintiff was not deceased, and she had a credit score.

128.    Due to Defendant Equifax's inaccurate reporting, Plaintiff was denied the credit she sought and needed from Tractor Supply/Citibank, N.A.

129.    By reporting Plaintiff as deceased and having no credit score to her potential creditor, Tractor Supply/Citibank, N.A., Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the contents of Plaintiff's credit report and the credit information it published and maintains concerning Plaintiff.

**Capital One Denies Plaintiff's Credit Application in March 2025**

130.    On or about March 29, 2025, and needing a credit card to make everyday purchases, Plaintiff applied to get pre-approved for a Capital One QUICKSILVER credit card.

131.    As part of her online application, Plaintiff provided her personal identification information, including her Social Security number, and authorized Capital One to request her credit reports and scores.

132.    On March 29, 2025, in order to determine whether Plaintiff qualified for the credit that she sought, Capital One purchased a copy of Plaintiff's credit report from Equifax.

133.    Capital One could not pre-approve Plaintiff for a QUICKSILVER credit card and denied Plaintiff's credit application.

134.    On or about March 29, 2025, Equifax published a credit report regarding Plaintiff to Capital One stating that Plaintiff is "deceased" and, consequently, that she does not have a credit score.

135.    On or about March 29, 2025, Capital One mailed Plaintiff written correspondence confirming the same. Capital One's denial letter specifically stated, in relevant part, "Here are the reasons why we couldn't match you with an offer: "Based on your credit report from one or more of the agencies on the back of this letter, applicant is reported as deceased."

136.    Defendant Equifax's credit report regarding Plaintiff was grossly inaccurate: as of March 29, 2025, Plaintiff was not deceased, and she had a credit score.

137.    Due to Defendant Equifax's inaccurate reporting, Plaintiff was denied the credit she sought and needed from Capital One.

138.    By reporting Plaintiff as deceased and having no credit score to her potential creditor, Capital One, Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the contents of Plaintiff's credit report and the credit information it published and maintains concerning Plaintiff.

**Plaintiff Confirms Defendant Equifax's False Deceased Reporting in Her April 2025 Credit Report**

139.    In or about late April 2025, Plaintiff requested a copy of her Equifax credit report, which she received on or about April 21, 2025.

140.    Upon review, Plaintiff confirmed that Defendant Equifax was reporting her as deceased in conjunction with two credit tradelines, Barclays Bank Delaware and BMW Financial Services, which appeared on Plaintiff's Equifax credit file as follows:

> Account: BARCLAYS BANK DELAWARE
> Account #: xxxxxxxxxxxx 5748
> Date Opened: Jan 22, 2019
> Payment Responsibility: UNDESIGNATED
> Activity Designator: PAID_AND_CLOSED
> Account Status: CONSUMER_DECEASED
> Loan Type: Credit Card
>
> Account: BMW FINANCIAL SERVICES
> Account #: xxxxxxxxxxxx 0982
> Date Opened: May 26, 2017
> Payment Responsibility: UNDESIGNATED
> Account Status: CONSUMER_DECEASED
> Loan Type: Auto

**New American Funding Denies Plaintiff's Credit Application for a Home Equity Line of Credit in April 2025**

141.    In or about late April 2025, and in need of a home equity line of credit ("HELOC") in the amount of $78,000.00, Plaintiff applied online for a HELOC with New American Funding.

142.    As part of her online credit application, Plaintiff provided her personal identification information, including her Social Security number, and authorized New American Funding to request her credit reports and scores.

143.    On April 23, 2025, in order to determine whether Plaintiff qualified for the credit that she sought, New American Funding purchased a tri-merge credit report regarding Plaintiff from Informative Research.

144.    That same day, Informative Research purchased Plaintiff's credit file from Equifax, Experian, and Trans Union and assembled and merged their respective credit information into a tri-merge credit report, which it sold to New American Funding.

145.    The tri-merge credit report prepared by Informative Research showed that Plaintiff had credit scores from both Experian and Trans Union, but that Equifax was reporting Plaintiff as "deceased" and, consequently, with no credit score.

146.    Based on the credit report produced by Informative Research, New American Funding denied Plaintiff's mortgage loan application.

147.    The credit report that Informative Research sold to New American Funding was patently inconsistent—it contained Plaintiff's Experian and Trans Union credit scores and numerous active, open credit tradelines (two indications that Plaintiff is alive) but did not contain a credit score from Equifax and, instead, reported Plaintiff as deceased.

148.    Despite receiving patently inconsistent information, from multiple sources, Informative Research made no effort to determine whether Plaintiff was in fact deceased prior to publishing its report. Informative Research could have easily reached out to Plaintiff and allowed her to prove she was alive through the submission of basic documentation. Informative Research could have also reached out to the Big Three and/or Equifax to resolve the inconsistencies in the information it received but failed to do so.

149.    Informative Research's report also included data from Equifax, Experian, and Trans Union regarding Plaintiff's credit and payment history, which should have alerted Informative Research that Plaintiff was very much alive.

150.    The credit report prepared by Equifax and provided to Informative Research showed Equifax was reporting Plaintiff as "deceased" and, consequently, with no credit score.

151.    Based on the credit report produced by Equifax and provided to Informative Research, New American Funding denied Plaintiff's HELOC application.

152.    The credit report that Equifax provided to Informative Research was patently inconsistent—it contained multiple active, open credit tradelines (one indication that Plaintiff is alive) but did not contain a credit score from Equifax and, instead, reported Plaintiff as deceased.

153.    Despite evidence to the contrary, Equifax made no effort to determine whether Plaintiff was in fact deceased prior to publishing its report. Equifax could have easily reached out to Plaintiff and allowed her to prove she was alive through the submission of basic documentation. Equifax could have also reached out to the other two credit bureaus to resolve the inconsistencies in the information it received but failed to do so.

154.    Due to the credit denial caused by Defendants Equifax's and Informative Research's inaccurate reports, Plaintiff lost the opportunity to obtain the HELOC she was seeking.

155.    Defendants Equifax's and Informative Research's credit reports regarding Plaintiff were grossly inaccurate: as of April 23, 2025, Plaintiff was not deceased, and she had a credit score.

156.    By reporting Plaintiff as deceased and having no credit score to her potential creditor, New American Funding, Defendants Equifax and Informative Research both violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the contents of Plaintiff's credit report and the credit information they published and maintain concerning Plaintiff.

**Plaintiff's First Dispute with Defendant Equifax in May 2025**

157.    On or about May 7, 2025, Plaintiff, concerned, stressed, and anxious about Equifax's inaccurate credit reporting and its subsequent impact on her ability to obtain credit,

mailed a letter to Equifax disputing all inaccurate deceased notations on her report, clearly stating that she was not deceased and that she understood the problem originated with the Barclays Bank Delaware and BMW Financial Services tradelines, which appeared on her Equifax report as follows:

> Account: BARCLAYS BANK DELAWARE
> Account #: xxxxxxxxxxxx 5748
> Date Opened: Jan 22, 2019
> Payment Responsibility: UNDESIGNATED
> Activity Designator: PAID_AND_CLOSED
> Account Status: CONSUMER_DECEASED
> Loan Type: Credit Card
>
> Account: BMW FINANCIAL SERVICES
> Account #: xxxxxxxxxxxx 0982
> Date Opened: May 26, 2017
> Payment Responsibility: UNDESIGNATED
> Account Status: CONSUMER_DECEASED
> Loan Type: Auto

158.    As part of her dispute, Plaintiff provided sufficient personal identification information, including her full name, date of birth, and current address; a photocopy of her current Connecticut Driver's License; and a copy of her inaccurate April 21, 2025, Equifax credit report.

159.    Plaintiff insisted that she is in fact alive, not dead, and requested that Equifax remove any deceased messages or notations from her credit file.

160.    Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send her a corrected copy of her credit report.

**Defendants Equifax's Method for Considering Consumer Credit Report Disputes**

161.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

162.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industry's

standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

163.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II." It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

164.    Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

165.    Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

166.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

167.    These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

168.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

169.    Once the data furnisher, like American Express, completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as

accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via eOSCAR.

**Defendant Equifax's Response to Plaintiff's May 2025 Dispute**

170.    On or about May 20, 2025, Plaintiff received written correspondence from Equifax via mail stating, among other information, "We received your request concerning inaccurate information on your Equifax credit file. The documents you provided were illegible. To ensure that your request is processed without further delay, please enlarge photocopies of any items that contain small print. Because the information you provided as proof of your identity does not match the information we currently have on your credit file, we ask that you send us a copy of two different items—one from each of the two categories listed below." This is a form letter that Equifax frequently sends consumers when it doesn't want to comply with its legal obligations under the FCRA, 15 U.S.C. § 1681i.

171.    Plaintiff's May 7, 2025, dispute letter and all documents attached thereto were clear and legible.

172.    Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's May 2025 dispute and failed to correct the inaccurate deceased notations contained in Plaintiff's report, in violation of 15 U.S.C. § 1681i.

173.    As a result, and despite her May 7 dispute, Defendant Equifax was still reporting Plaintiff's Barclays Bank Delaware and BMW Financial Services tradelines with a deceased notation.

174.    By failing to properly update the status of the Barclays Bank Delaware and BMW Financial Services tradelines reporting on Plaintiff's credit file and report, Defendant Equifax failed to conduct a reasonable reinvestigation to determine whether the disputed information was

inaccurate and to record the current status of the disputed information or delete the deceased notations from Plaintiff's credit file and report before the end of the 30-day period beginning on the date on which Defendant Equifax received notice of the dispute from Plaintiff as required by 15 U.S.C. § 1681i(a)(1)(A).

175.    Thereafter, Defendant Equifax failed to correct or delete the inaccurate deceased notations appearing in Plaintiff's credit file and report and continued to report her as deceased and without a credit score, both of which are inaccurate.

**Capital One Denies Plaintiff's Credit Application in May 2025**

176.    On or about May 8, 2025, and needing a credit card to make everyday purchases, Plaintiff again applied to get pre-approved for a Capital One QUICKSILVER credit card.

177.    As part of her online application, Plaintiff provided her personal identification information, including her Social Security number, and authorized Capital One to request her credit reports and scores.

178.    On May 8, 2025, in order to determine whether Plaintiff qualified for the credit that she sought, Capital One purchased a copy of Plaintiff's credit report from Equifax.

179.    Capital One could not pre-approve Plaintiff for a QUICKSILVER credit card and denied Plaintiff's credit application.

180.    On or about May 8, 2025, Equifax published a credit report regarding Plaintiff to Capital One stating that Plaintiff is "deceased" and, consequently, that she does not have a credit score.

181.    On or about May 8, 2025, Capital One mailed Plaintiff written correspondence confirming the same. Capital One's denial letter specifically stated, in relevant part, "Here are the

reasons why we couldn't match you with an offer: "Based on your credit report from one or more of the agencies on the back of this letter, applicant is reported as deceased."

182.    Defendant Equifax's credit report regarding Plaintiff was grossly inaccurate: as of May 8, 2025, Plaintiff was not deceased, and she had a credit score.

183.    Due to Defendant Equifax's inaccurate reporting, Plaintiff was denied the credit she sought and needed from Capital One.

184.    By reporting Plaintiff as deceased and having no credit score to her potential creditor, Capital One, Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the contents of Plaintiff's credit report and the credit information it published and maintains concerning Plaintiff.

**Plaintiff's Second Dispute with Defendant Equifax in June 2025**

185.    On or about June 6, 2025, Plaintiff, once again concerned, stressed, and anxious about Equifax's inaccurate credit reporting and its subsequent impact on her ability to obtain credit, mailed a letter to Equifax disputing all inaccurate deceased notations on her report, clearly stating that she was not deceased and that she understood the problem originated with the Barclays Bank Delaware and BMW Financial Services tradelines, which appeared on her Equifax report as follows:

> Account: BARCLAYS BANK DELAWARE
> Account #: xxxxxxxxxxxx 5748
> Date Opened: Jan 22, 2019
> Payment Responsibility: UNDESIGNATED
> Activity Designator: PAID_AND_CLOSED
> Account Status: CONSUMER_DECEASED
> Loan Type: Credit Card
>
> Account: BMW FINANCIAL SERVICES
> Account #: xxxxxxxxxxxx 0982
> Date Opened: May 26, 2017
> Payment Responsibility: UNDESIGNATED

Account Status: CONSUMER_DECEASED
Loan Type: Auto

186.   As part of her dispute, Plaintiff provided sufficient personal identification information, including her full name, date of birth, and current address; a photocopy of her current Connecticut Driver's License; and a copy of her inaccurate April 21, 2025, Equifax credit report.

187.   Plaintiff insisted that she is in fact alive, not dead, and requested that Equifax remove any deceased messages or notations from her credit file.

188.   Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send her a corrected copy of her credit report.

**WebBank/Imagine Denies Plaintiff's Credit Application in June 2025**

189.   On or about June 7, 2025, and needing a credit card to make everyday purchases, Plaintiff applied to for an Imagine credit card through WebBank, in partnership with Atlanticus.

190.   As part of her online application, Plaintiff provided her personal identification information, including her Social Security number, and authorized WebBank/Atlanticus to request her credit reports and scores.

191.   On June 7, 2025, in order to determine whether Plaintiff qualified for the credit that she sought, WebBank/Atlanticus purchased a copy of Plaintiff's credit report from Equifax.

192.   WebBank/Atlanticus could not approve Plaintiff for a credit card and denied Plaintiff's credit application.

193.   On or about June 7, 2025, Equifax published a credit report regarding Plaintiff to WebBank/Atlanticus stating that Plaintiff is "deceased" and, consequently, that she does not have a credit score.

194.    On or about June 7, 2025, WebBank/Imagine emailed Plaintiff written correspondence confirming the same. WebBank/Atlanticus's denial letter specifically stated, in relevant part, "No Credit Score due to lack of credit history."

195.    Defendant Equifax's credit report regarding Plaintiff was grossly inaccurate: as of June 7, 2025, Plaintiff was not deceased, and she had a credit score.

196.    Due to Defendant Equifax's inaccurate reporting, Plaintiff was denied the credit she sought and needed from WebBank/Atlanticus.

197.    By reporting Plaintiff as deceased and having no credit score to her potential creditor, WebBank/Atlanticus/Imagine, Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the contents of Plaintiff's credit report and the credit information it published and maintains concerning Plaintiff.

### Defendant Equifax's Response to Plaintiff's June 2025 Dispute

198.    On or about June 18, 2025, Plaintiff received written correspondence from Equifax via mail stating, among other information, "We received your request concerning inaccurate information on your Equifax credit file. The documents you provided were illegible. To ensure that your request is processed without further delay, please enlarge photocopies of any items that contain small print. Because the information you provided as proof of your identity does not match the information we currently have on your credit file, we ask that you send us a copy of two different items—one from each of the two categories listed below." This is a form letter that Equifax frequently sends consumers when it doesn't want to comply with its legal obligations under the FCRA, 15 U.S.C. § 1681i.

199.    Plaintiff's June 6, 2025, dispute letter and all documents attached thereto were clear and legible.

200.    Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's June 2025 dispute and failed to correct the inaccurate deceased notations contained in Plaintiff's report, in violation of 15 U.S.C. § 1681i.

201.    As a result, and despite her June 6 dispute, Defendant Equifax was still reporting Plaintiff's Barclays Bank Delaware and BMW Financial Services tradelines with a deceased notation.

202.    By failing to properly update the status of the Barclays Bank Delaware and BMW Financial Services tradelines reporting on Plaintiff's credit file and report, Defendant Equifax failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and to record the current status of the disputed information or delete the deceased notations from Plaintiff's credit file and report before the end of the 30-day period beginning on the date on which Defendant Equifax received notice of the dispute from Plaintiff as required by 15 U.S.C. § 1681i(a)(1)(A).

203.    Thereafter, Defendant Equifax failed to correct or delete the inaccurate deceased notations appearing in Plaintiff's credit file and report and continued to report her as deceased and without a credit score, both of which are inaccurate.

**Plaintiff's Third Dispute to Defendant Equifax in July 2025**

204.    On or about July 8, 2025, Plaintiff, once again concerned, stressed, and anxious about Equifax's inaccurate credit reporting and its subsequent impact on her ability to obtain credit, mailed a letter to Equifax disputing all inaccurate deceased notations on her report, clearly stating that she was not deceased and that she understood the problem originated with the Barclays Bank

Delaware and BMW Financial Services tradelines, which appeared on her Equifax report as follows:

> Account: BARCLAYS BANK DELAWARE
> Account #: xxxxxxxxxxxx 5748
> Date Opened: Jan 22, 2019
> Payment Responsibility: UNDESIGNATED
> Activity Designator: PAID_AND_CLOSED
> Account Status: CONSUMER_DECEASED
> Loan Type: Credit Card
>
> Account: BMW FINANCIAL SERVICES
> Account #: xxxxxxxxxxxx 0982
> Date Opened: May 26, 2017
> Payment Responsibility: UNDESIGNATED
> Account Status: CONSUMER_DECEASED
> Loan Type: Auto

205.    As part of her dispute, Plaintiff provided sufficient personal identification information, including her full name, date of birth, and current address; a photocopy of her current Connecticut Driver's License; and a copy of her inaccurate April 21, 2025 Equifax credit report.

206.    Plaintiff insisted that she is in fact alive, not dead, and requested that Equifax remove any deceased messages or notations from her credit file.

207.    Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send her a corrected copy of her credit report.

**Defendant Equifax's Response to Plaintiff's July 2025 Dispute**

208.    On or about July 24, 2025, Plaintiff received written correspondence from Equifax via mail stating, among other information, "Because the information you provided as proof of your identity does not match the information we currently have on your credit file, we ask that you send us a copy of two different items—one from each of the two categories listed below." This is a form letter that Equifax frequently sends consumers when it doesn't want to comply with its legal obligations under the FCRA, 15 U.S.C. § 1681i.

209. Plaintiff's July 8, 2025, dispute contained more than sufficient documentation conclusively establishing her identity, including photocopies of her driver's license and Social Security card.

210. Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's July 2025 dispute and failed to correct the inaccurate deceased notations contained in Plaintiff's report, in violation of 15 U.S.C. § 1681i.

211. As a result, and despite her July 8 dispute, Defendant Equifax was still reporting Plaintiff's Barclays Bank Delaware and BMW Financial Services tradelines with a deceased notation.

212. By failing to properly update the status of the Barclays Bank Delaware and BMW Financial Services tradelines reporting on Plaintiff's credit file and report, Defendant Equifax failed to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and to record the current status of the disputed information or delete the deceased notations from Plaintiff's credit file and report before the end of the 30-day period beginning on the date on which Defendant Equifax received notice of the dispute from Plaintiff as required by 15 U.S.C. § 1681i(a)(1)(A).

213. Thereafter, Defendant Equifax failed to correct or delete the inaccurate deceased notations appearing in Plaintiff's credit file and report and continued to report her as deceased and without a credit score, both of which are inaccurate.

**The Bank of Missouri/Aspire Denies Plaintiff's Credit Application in August 2025**

214. On or about August 8, 2025, and still in need of a credit card to make everyday purchases, Plaintiff applied to get pre-approved for an Aspire credit card, which is issued through The Bank of Missouri.

215.    As part of her online application, Plaintiff provided her personal identification information, including her Social Security number, and authorized The Bank of Missouri/Aspire to request her credit reports and scores.

216.    On August 8, 2025, in order to determine whether Plaintiff qualified for the credit that she sought, The Bank of Missouri/Aspire purchased a copy of Plaintiff's credit report from Equifax.

217.    The Bank of Missouri/Aspire could not approve Plaintiff for a credit card and denied Plaintiff's credit application.

218.    On or about August 8, 2025, Equifax published a credit report regarding Plaintiff to The Bank of Missouri/Aspire stating that Plaintiff is "deceased" and, consequently, that she does not have a credit score.

219.    On or about August 8, 2025, The Bank of Missouri/Aspire emailed Plaintiff written correspondence confirming the same. The Bank of Missouri/Aspire's denial letter specifically stated, in relevant part, "No Credit Score due to lack of credit history."

220.    Defendant Equifax's credit report regarding Plaintiff was grossly inaccurate: as of August 8, 2025, Plaintiff was not deceased, and she had a credit score.

221.    Due to Defendant Equifax's inaccurate reporting, Plaintiff was denied the credit she sought and needed from The Bank of Missouri/Aspire.

222.    By reporting Plaintiff as deceased and having no credit score to her potential creditor, The Bank of Missouri/Aspire, Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the contents of Plaintiff's credit report and the credit information it published and maintains concerning Plaintiff.

**Capital One Denies Plaintiff's Credit Application in August 2025**

223.    On or about August 9, 2025, desperate and still in need of a credit card to make everyday purchases, Plaintiff applied once again to get pre-approved for a Capital One QUICKSILVER credit card.

224.    As part of her online application, Plaintiff provided her personal identification information, including her Social Security number, and authorized Capital One to request her credit reports and scores.

225.    On August 9, 2025, in order to determine whether Plaintiff qualified for the credit that she sought, Capital One purchased a copy of Plaintiff's credit report from Equifax.

226.    Capital One could not pre-approve Plaintiff for a QUICKSILVER credit card and denied Plaintiff's credit application.

227.    On or about August 9, 2025, Equifax published a credit report regarding Plaintiff to Capital One stating that Plaintiff is "deceased" and, consequently, that she does not have a credit score.

228.    On or about August 9, 2025, Capital One mailed and emailed Plaintiff written correspondence confirming the same. Capital One's denial letter specifically stated, in relevant part, "Here are the reasons why we couldn't match you with an offer: "Based on your credit report from one or more of the agencies on the back of this letter, applicant is reported as deceased."

229.    Defendant Equifax's credit report regarding Plaintiff was grossly inaccurate: as of August 9, 2025, Plaintiff was not deceased, and she had a credit score.

230.    Due to Defendant Equifax's inaccurate reporting, Plaintiff was denied the credit she sought and needed from Capital One.

231.    By reporting Plaintiff as deceased and having no credit score to her potential creditor, Capital One, Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the contents of Plaintiff's credit report and the credit information it published and maintains concerning Plaintiff.

**Plaintiff's Fourth Dispute to Defendant Equifax in August 2025**

232.    On or about August 12, 2025, Plaintiff, increasingly concerned, stressed, and anxious about Equifax's inaccurate credit reporting and its subsequent impact on her ability to obtain credit, mailed a letter to Equifax disputing all inaccurate deceased notations on her report, clearly stating that she was not deceased and that she understood the problem originated with the Barclays Bank Delaware and BMW Financial Services tradelines, which appeared on her Equifax report as follows:

> Account: BARCLAYS BANK DELAWARE
> Account #: xxxxxxxxxxxx 5748
> Date Opened: Jan 22, 2019
> Payment Responsibility: UNDESIGNATED
> Activity Designator: PAID_AND_CLOSED
> Account Status: CONSUMER_DECEASED
> Loan Type: Credit Card
>
> Account: BMW FINANCIAL SERVICES
> Account #: xxxxxxxxxxxx 0982
> Date Opened: May 26, 2017
> Payment Responsibility: UNDESIGNATED
> Account Status: CONSUMER_DECEASED
> Loan Type: Auto

233.    As part of her dispute, Plaintiff provided sufficient personal identification information, including her full name, date of birth, and current address; a photocopy of her current Connecticut Driver's License; and a copy of her inaccurate April 21, 2025, Equifax credit report.

234.    Plaintiff insisted that she is in fact alive, not dead, and requested that Equifax remove any deceased messages or notations from her credit file.

235.    Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send her a corrected copy of her credit report.

**Defendant Equifax's Response to Plaintiff's August 2025 Dispute**

236.    On or about August 24, 2025, Plaintiff received written correspondence from Equifax via mail, which confirmed that Equifax had finally removed the disputed deceased notations from her credit report.

237.    As a result of the "deceased" notations appearing on Plaintiff's credit file and reports throughout at least the past two (2) years, Defendants made it practically impossible for Plaintiff to obtain credit.

238.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered actual damages including being denied credit; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating; having numerous open credit accounts automatically closed due to being considered "deceased"; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; financial instability; lost income; damage to her mental and psychical health, including being diagnosed with chronic Post-Traumatic Stress Disorder and Dissociative Identity Disorder; and emotional distress including, but not limited to, loss of sleep; stress; anxiety; and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and being reported as deceased and without a credit score.

239.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

240.   At all times pertinent hereto, the conduct of Defendants, as well as that of their agents, servants, and/or employees, was intentional, willful, reckless, and in grossly negligent disregard for federal law and the rights of Plaintiff herein.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendants Equifax, Trans Union, and Informative Research)

241.   Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-240 as if fully stated herein.

242.   Defendants published inaccurate credit reports regarding Plaintiff to her potential creditors that falsely stated that she was deceased and had no credit score, despite conflicting evidence indicating that she had open and active credit accounts and was, in fact, alive.

243.   Defendants both violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintain concerning Plaintiff.

244.   As a result of Defendants' conduct, action, and inaction, Plaintiff suffered actual damages including being denied credit; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating; having numerous open credit accounts automatically closed due to being considered "deceased"; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; financial instability; lost income; damage to her mental and psychical health, including being diagnosed with chronic Post-Traumatic Stress Disorder and Dissociative Identity Disorder; and emotional distress including, but not limited to, loss of sleep; stress; anxiety; and the mental and emotional pain, anguish,

humiliation, and embarrassment of credit denials and being reported as deceased and without a credit score.

245.    Defendants' conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

246.    Plaintiff is entitled to recover attorney's fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendant Equifax)**

247.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-240 of this Complaint as if fully stated herein.

248.    The FCRA mandates that Defendant Equifax, a CRA, investigate the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The FCRA imposes a 30-day time limitation for the completion of such an investigation. *Id.*

249.    The FCRA provides that if Defendant Equifax conducts an investigation of disputed information and confirms that the information is, in fact, inaccurate or is unable to verify the accuracy of the disputed information, it is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

250.    Between May 2025 and August 2025, Plaintiff lodged multiple disputes with Defendant Equifax, pleading with it to comply with its statutory reinvestigation obligations and correct and/or delete specific items in her credit file that are patently inaccurate, misleading, and

41

highly damaging to her and her ability to obtain credit, namely, references to her being "deceased" and as not having an Equifax credit score.

251.    Defendant Equifax failed to conduct a reasonable reinvestigation within 30 days of receiving Plaintiff's disputes and Defendant Equifax allowed patently false and highly damaging information to remain in Plaintiff's credit files, namely, the deceased messages and notations.

252.    Defendant Equifax violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file and reports.

253.    As a result of Defendant Equifax's conduct, action, and inaction, Plaintiff suffered actual damages including being denied credit; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating; having numerous open credit accounts automatically closed due to being considered "deceased"; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; financial instability; lost income; damage to her mental and psychical health, including being diagnosed with chronic Post-Traumatic Stress Disorder and Dissociative Identity Disorder; and emotional distress including, but not limited to, loss of sleep; stress; anxiety; and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and being reported as deceased and without a credit score.

254.    Defendant Equifax's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court

pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

255.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a)    Determining that Defendants negligently and/or willfully violated the FCRA;

b)    Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)    Awarding Plaintiff reasonable attorneys' fees and costs from Defendants as provided by the FCRA; and

d)    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

256.    Plaintiff demands a trial by jury.

Dated: September 22, 2025

/s/ Jeffrey Gentes
Jeffrey Gentes, CT Bar No. 28651
Jerome N. Frank LSO
P.O. Box 209090
New Haven, CT 06520-9090
Telephone: (203) 432-4806
Fax: (203) 432-1426
Email: Jeffrey.gentes@ylsclinics.org

Hans W. Lodge, MN Bar No. 397012*
Ivy L. Marsnik, MN Bar No. 0403177*
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413

Telephone: (612) 594-5999
Fax: (612) 584-4470
Email: hlodge@bergermontague.com
Email: imarsnik@bergermontague.com
*Pro Hac Vice Forthcoming*

*ATTORNEYS FOR PLAINTIFF*